UNITED STATED DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF THE BANCORP COMMERCIAL MORTGAGE 2019-CRE5 TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-CRE5,<br><br>                    Plaintiff,<br><br>          - against -<br><br>SAMCOM 48 (DE) LLC, AI YUN CHEN, WENDY CHAU, SAM STRULOVITCH, 37-10 114TH STREET ML FUNDING, LLC, KE HUANG SHI, THE NEW YORK CITY DEPARTMENT OF FINANCE, THE NEW YORK CITY ENVIRONMENTAL CONTROL BOARD, and "JOHN DOE #1" through "JOHN DOE #20," the twenty names being fictitious and unknown to the Plaintiffs, the person or parties intended being the tenants, occupants, persons or corporations, if any, having or claiming an interest in lien upon the premises,<br><br>                    Defendants. | Case No.:  1:22-cv-02720-RPK-RLM<br><br><br><br><br><br>__AMENDED COMPLAINT__ |

Plaintiff Wilmington Trust, National Association, as Trustee for the Registered Holders of The Bancorp Commercial Mortgage 2019-CRE5 Trust, Commercial Mortgage Pass-Through Certificates, Series 2019-CRE5 ("Plaintiff" or "Lender"), acting by and through special servicer Trimont Real Estate Advisors, LLC ("Special Servicer"), not individually but solely in its authorized capacity as special servicer pursuant to that certain Pooling and Servicing Agreement, dated as of March 28, 2019 (the "PSA"), by its attorneys, Holland & Knight LLP, as and for its Amended Complaint (the "Complaint") respectfully alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this action to foreclose those certain Mortgages, as defined below herein, securing that certain Loan, as defined below herein, in the aggregate outstanding principal sum of $22,777,555.78 on that certain real property, and improvements thereon, commonly known as Holiday Inn LaGuardia Airport and located at 37-10 114th Street, Corona, New York 11368 (Block 1782 and Lot 19), and as more particularly described in Exhibit A to the Mortgages, as defined below herein, (the "Mortgaged Premises"), and to recover amounts due on the Guarantees, as defined below herein.   Plaintiff also asserts claims against the Mezzanine Lender (defined herein) for breaches of the Intercreditor Agreement (defined herein) in connection with the Mezzanine Lender's enforcement actions that impact Plaintiff's rights and remedies herein.

## THE PARTIES

2.      Plaintiff is the trustee of a REMIC Trust and real party in interest in this action. Wilmington Trust, National Association, is a national association with its designated main office located in Wilmington, Delaware.  For diversity purposes, a national bank is a citizen of the state in which the bank's main office, as set forth in its articles of association, is located.  Therefore, for purposes of 28 U.S.C. § 1332, Plaintiff is a citizen of the State of Delaware.

3.      Upon information and belief and at all times mentioned herein, SAMCOM 48 (DE) LLC ("SAMCOM" or "Borrower"), was and is a limited liability company organized and existing under the laws of the State of Delaware.  Upon information and belief, Borrower maintains its principal place of business at 3 Columbus Circle, 23rd floor, New York, New York 10019.  As Borrower is a limited liability company, its citizenship is determined by that of its members.  Upon information and belief, Borrower's sole member is or may be 37-10 114th Street ML Funding LLC ("ML Funding" or "Mezzanine Lender").   Upon information and belief, ML Funding's sole

member is Moinian Limited.  Moinian Limited is a foreign corporation organized under the laws of the British Virgin Islands and maintaining its principal place of business in New York, New York.  Upon information and belief, ML Funding is owned by Joseph Moinian, a resident of the State of New York.  Upon information and belief, Borrower's sole member was or is Chatus Mezz (DE) LLC ("Chatus").  Upon information and belief, Chatus was and is a limited liability company organized and existing under the laws of the State of Delaware, whose members are or were Sam Chang, 37-10 114 Lord Realty LLC and Lucky 7 Group LLC.  Upon information and belief, Sam Chang is a citizen of the State of New York.  Upon information and belief, the sole member of 37-10 114 Lord Realty LLC is Wendy Chau, who, as set forth below, is a citizen of the State of New York.  Upon information and belief, the sole member of Lucky 7 Group LLC is Ai Yun Chen, who, as set forth below, is also a citizen of the State of New York.  As such, Borrower is a citizen of the State of New York or the British Virgin Islands.  Borrower is made a defendant in this action because it is the obligor under the Notes, as defined below herein, and the owner of the Mortgaged Premises and the mortgagor under the Mortgages being foreclosed in this action.

4.     Upon information and belief, Ai Yun Chen ("Chen") is a citizen of the State of New York, who resides at 58-36 208th Street, Bayside, New York 11364 and is made a defendant in this action because he is the signatory of the Guarantees, as defined below herein, wherein he unconditionally guaranteed certain obligations of Borrower due under the Notes.

5.     Upon information and belief, Wendy Chau ("Chau," and together with Chen, collectively, "Guarantors") is a citizen of the State of New York, who resides at 25 Aldgate Drive E, Manhasset, New York 11030 and is made a defendant in this action because she is the signatory of the Guarantees, wherein she unconditionally guaranteed certain obligations of Borrower due under the Notes.

6.     Upon information and belief, Sam Strulovitch ("Strulovitch") is a citizen of the State of New York, who resides at 667 Myrtle Avenue, #103, Brooklyn, New York 11205 and is made a defendant in this action because he may have an interest in the Mortgaged Premises by virtue of: (i) that certain Memorandum of Contract by and between Borrower and Strulovitch dated January 3, 2020 and recorded in the Office of the City Register of the City of New York (the "City Register") on January 14, 2020 at City File Register Number ("CRFN") 2020000152289 (the "Strulovitch Contract"); and/or (ii) those certain claims set forth in the litigation that he commenced in Supreme Court of the State of New York, County of Queens captioned *Sam Strulovitch vs. Samcom, 48 (DE) LLC, d/b/a Holiday Inn LaGuardia Airport, et al.,* and assigned Index No. 700215/2022 (the "Strulovitch Action"); and/or (iii) that certain Notice of Pendency filed May 17, 2022, at Index No. 710625/2022, in the Supreme Court of the State of New York, County of Queens.

7.     Upon information and belief, as set forth above, ML Funding is a citizen of the British Virgin Islands and/or New York, which maintains a principal place of business located at c/o The Moinian Group, 3 Columbus Circle, 23rd Floor, New York, New York 10019, and is made a defendant in this action because it has or may have an interest in the Mortgaged Premises.

8.     Upon information and belief, Ke Huang Shi ("Shi") is a citizen of the State of Oklahoma, who resides at 2817 N Classen Blvd., Oklahoma City, Oklahoma 73106 and is made a defendant in this action because he may have an interest in the Mortgaged Premises by virtue of that certain Declaration of Restriction made on February 5, 2022 by Borrower, signed by Shi, and recorded on February 10, 2022 with the City Register at CRFN 2022000064684.

9.     Upon information and belief, The City of New York, Department of Finance ("DOF") is a New York City department maintaining its principal place of business at c/o New

York State Department of Financial Services, Office of General Counsel, One State Street, New York, NY 10004, or One Commerce Plaza, Albany, New York 1225.  As such, the DOF is a citizen of the State of New York.  DOF is made a defendant in this action because it has or may have an interest in the Mortgaged Premises by virtue of any unpaid taxes, tax liens, water rents, sewer rents and assessments, including but not limited to those certain liens and/or judgments set forth in **Exhibit 32** hereto.

10.     Upon information and belief, The City of New York, Environmental Control Board ("ECB") is a New York City department maintaining its principal place of business at 66 John Street, 10th Floor New York, New York 10038.  As such, ECB is a citizen of the State of New York.  ECB is made a defendant in this action because it may have an interest in the Mortgaged Premises by virtue of unpaid liens against the Mortgaged Premises including but not limited to those certain liens and/or judgments set forth on **Exhibit 33** hereto.

11.     Upon information and belief, "JOHN DOE #1" through "JOHN DOE #20" are fictitious names and unknown to the Plaintiff, and have been made defendants to this action because of possible claims or interests in possession or liens against the Mortgaged Premises.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

13.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391 because the Mortgaged Premises is located in this judicial district, at least one defendant resides in this judicial district, and a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district.

## THE LOAN DOCUMENTS

14.     On or about October 31, 2018, The Bancorp Bank ("Original Lender") loaned Borrower the aggregate principal sum of up to TWENTY-FOUR MILLION AND 00/100 DOLLARS ($24,00,000.00) (the "Loan"), which is comprised of three loans:  (1) a senior loan in the original principal amount of $21,000,000.00 (the "Senior Loan"), (2) a building loan in the original principal amount of up to $2,931,160.00 (the "Building Loan"), and (3) a project loan in the original principal amount of up to $68,840.00 (the "Project Loan").  The full $21,000,000 was advanced on the Senior Loan.  The aggregate amount of $1,777,555.78 was advanced on the Building Loan and Project Loan, collectively.

**A.     The Senior Loan**

15.     To evidence the Senior Loan, on or about October 31, 2018, Borrower executed and delivered to Original Lender that certain Amended & Restated Senior Loan Promissory Note, dated as of October 31, 2018, in the original principal sum of $21,00,000.00 (the "Senior Loan Note"), a true and correct copy of which is annexed hereto as **Exhibit 1**.

16.     In connection with the Loan, Borrower and Original Lender entered into that certain Senior Loan Agreement, dated as of October 31, 2018, (the "Senior Loan Agreement"), a true and correct copy of which is annexed hereto as **Exhibit 2**.

17.     The Senior Loan Note is secured by, *inter alia*, that certain Amended and Restated Senior Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of October 31, 2018, executed by Borrower in favor of Original Lender encumbering the Mortgaged Premises (the "Senior Loan Mortgage").

18.      The Senior Loan Mortgage was recorded on November 9, 2018 with the City Register at CRFN 2018000372557.  A true and correct copy of the Senior Loan Mortgage is

annexed hereto as **Exhibit 3**.

19.     The Senior Loan Note is further secured by, *inter alia*, that certain Senior Loan Assignment of Leases and Rents, dated as of October 31, 2018, executed by Borrower in favor of Original Lender (the "Senior Loan ALR").

20.     The Senior Loan ALR was recorded on November 9, 2018 with the City Register at CRFN 2018000372558.  A true and correct copy of the Senior Loan ALR is annexed hereto as **Exhibit 4**.

**B.     The Building Loan**

21.     To evidence the Building Loan, on or about October 31, 2018, Borrower executed and delivered to Original Lender that certain Building Loan Amended and Restated Promissory Note, dated October 31, 2018, in the original principal amount of up to $2,931,160.00 (the "Building Loan Note"), a true and correct copy of which is annexed hereto as **Exhibit 5**.

22.     In connection with the Building Loan, Borrower and Original Lender entered into that certain Building Loan Agreement, dated October 31, 2018, (the "Building Loan Agreement"), and filed on November 5, 2018 with the Queens County Clerk's Office as Control No. 002305230-01, a true and correct copy of which is annexed hereto as **Exhibit 6**.

23.     The Building Loan Note is secured by, *inter alia*, that certain Building Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of October 31, 2018, executed by Borrower in favor of Original Lender encumbering the Mortgaged Premises (the "Building Loan Mortgage").

24.      The Building Loan Mortgage was recorded on November 9, 2018 with the City Register at CRFN 2018000372559.  A true and correct copy of the Building Loan Mortgage is annexed hereto as **Exhibit 7**.

25.     The Building Loan Note is further secured by, *inter alia*, that certain Building Loan

Assignment of Leases and Rents, dated as of October 31, 2018, executed by Borrower in favor of Original Lender (the "Building Loan ALR").

26.     The Building Loan ALR was recorded on November 9, 2018 with the City Register at CRFN 2018000372560.  A true and correct copy of the Building Loan ALR is annexed hereto as **Exhibit 8**.

## C.     The Project Loan

27.     To evidence the Project Loan, on or about October 31, 2018, Borrower executed and delivered to Original Lender that certain Project Loan Amended and Restated Promissory Note, dated October 31, 2018, in the original principal amount of up to $68,840.00 (the "Project Loan Note," and, together with the Senior Loan Note and the Building Loan Note, collectively, the "Notes").  A true and correct copy of the Project Loan Note is annexed hereto as **Exhibit 9**.

28.     In connection with the Project Loan, Borrower and Original Lender entered into that certain Project Loan Agreement, dated October 31, 2018, (the "Project Loan Agreement," and together with the Senior Loan Agreement and Building Loan Agreement, collectively, the "Loan Agreements").  A true and correct copy of the Project Loan Agreements is annexed hereto as **Exhibit 10**.

29.     The Project Loan Note is secured by, *inter alia*, that certain Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of October 31, 2018, executed by Borrower in favor of Original Lender encumbering the Mortgaged Premises (the "Project Loan Mortgage," and together with the Senior Loan Mortgage and Building Loan Mortgage, collectively, the "Mortgages").

30.      The Project Loan Mortgage was recorded on November 9, 2018 with the City Register at CRFN 2018000372561.  A true and correct copy of the Project Loan Mortgage is annexed hereto as **Exhibit 11**.

31.     The Project Loan Note is further secured by, *inter alia*, that certain Project Loan Assignment of Leases and Rents, dated as of October 31, 2018, executed by Borrower in favor of Original Lender (the "Project Loan ALR," and together with the Senior Loan ALR and Building Loan ALR, collectively, the "Assignments of Rents").

32.     Project Loan ALR was recorded on November 9, 2018 with the City Register at CRFN 2018000372562.  A true and correct copy of the Project Loan ALR is annexed hereto as **Exhibit 12**.

**D.     Other Loan Documents**

33.     As further security for the Loan, on October 31, 2018, Guarantors executed in favor of, and delivered to, Original Lender that certain Guaranty of Recourse Obligations (the "Recourse Guaranty") unconditionally guaranteeing certain obligations of Borrower due or to become due under the Loan.  A true and correct copy of the Recourse Guaranty is annexed hereto as **Exhibit 13**.

34.     As further security for the Loan, on October 31, 2018, Guarantors executed in favor of, and delivered to, Original Lender that certain Guaranty of Completion (the "Completion Guaranty" and, together with the Recourse Guaranty, collectively, the "Guarantees") unconditionally guaranteeing Borrower's completion of the Work, as defined therein.  A true and correct copy of the Completion Guaranty is annexed hereto as **Exhibit 14**.

35.     In connection with the Loan, UCC-1 Financing Statements were filed with the Queens County Clerk's Office under CRFNs 2018000370525, 2018000370526 and 2018000370527 (the "County UCCs").  True and correct copies of the County UCCs are annexed hereto as **Exhibit 15**.

36.     In connection with the Loan, UCC-1 Financing Statements were filed with the Delaware Division of Corporations at File Number 20187667104, 20187667211, and

20187667237 (the "State UCCs").  True and correct copy of the State UCCs are annexed hereto as **Exhibit 16**.

37.     In furtherance of the Loan, Borrower, Original Lender and Packard Hospitality Management, LLC ("Manager") executed that certain Cash Management Agreement, dated as of October 31, 2018 (the "Cash Management Agreement").

38.     The Notes, Loan Agreements, Mortgages, Assignments of Leases, County UCCs, State UCCs, and Guarantees, together with all other documents and agreements evidencing and/or securing the Loan are collectively referred to as the "Loan Documents."

**E.**     **Assignment of the Loan and Loan Documents to Documents to the Plaintiff**

39.     On or about March 28, 2018, Original Lender assigned the Loan and all Loan Documents, including the Notes and Mortgages, to Plaintiff.

40.     In connection with the assignment to Plaintiff, Original Lender executed and delivered to Plaintiff:

a.     that certain Allonge to the Senior Loan Note executed by the Original Lender in favor of Plaintiff, true and correct copies of which are affixed to the true and correct copy of the Notes annexed hereto as Exhibit 1;

b.     that certain Assignment of Mortgage, dated as of March 25, 2019 and effective as of March 28, 2019, and recorded on May 2, 2019 at CRFN 2019000140310 assigning the Senior Loan Mortgage to Plaintiff (the "Senior Loan Mortgage Assignment"), a true and correct copy of which is annexed hereto as **Exhibit 17**;

c.     that certain Assignment of Senior Loan Assignment of Leases and Rents, dated as of March 25, 2019 and effective as of March 28, 2019, and recorded on May 2, 2019 at CRFN 2019000140311 (the "Senior Loan ALR Assignment"), a true and correct copy of which is annexed hereto as **Exhibit 18**;

d.     that certain Allonge to the Building Loan Note executed by the Original Lender in favor of Plaintiff, true and correct copies of which are affixed to the true and correct copy of the Notes annexed hereto as Exhibit 5;

e.     that certain Assignment of Building Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of March 25, 2019 and

effective as of March 28, 2019, and recorded on May 2, 2019 at CRFN 2019000140078 assigning the Building Loan Mortgage (the "Building Loan Mortgage Assignment") a true and correct copy of which is annexed hereto as **Exhibit 19**;

f.  that certain Assignment of Building Loan Assignment of Leases and Rents, dated as of March 25, 2019 and effective as of March 28, 2019, and recorded on May 2, 2019 at CRFN 2019000140079 (the "Building Loan ALR Assignment"), a true and correct copy of which is annexed hereto as **Exhibit 20**;

g.  that certain Allonge to the Project Loan Note executed by the Original Lender in favor of Plaintiff, true and correct copies of which are affixed to the true and correct copy of the Notes annexed hereto as Exhibit 9;

h.  that certain Assignment of Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of March 25, 2019 and effective as of March 28, 2019, and recorded on May 6, 2019 at CRFN 2019000143784 (the "Project Loan Mortgage Assignment," and together with the Senior Loan Mortgage Assignment and the Building Loan Mortgage Assignment, collectively, the "Mortgage Assignments"), a true and correct copy of which is annexed hereto as **Exhibit 21**;

i.  that certain Assignment of Project Loan Assignment of Leases and Rents, dated as of March 25, 2019 and effective as of March 28, 2019, and recorded on May 6, 2019 at CRFN 2019000143785 (the "Project Loan ALR Assignment," and together with the Senior Loan ALR Assignment and the Building Loan ALR Assignment, collectively, the "ALR Assignments"), a true and correct copy of which is annexed hereto as **Exhibit 22**;

j.  those certain UCC-3 Financing Statements, assigning the County UCCs to Plaintiff, recorded at CRFNs 2019000140312, 2019000140080 and 2019000143786, true and correct copies of which are annexed hereto as **Exhibit 23**; and

k.  those certain UCC-3 Financing Statements, assigning the State UCCs to Plaintiff at Amendment Nos. 20194160409, 20194160144 and 20194160243, a true and correct copy of which is annexed hereto as **Exhibit 24**.

41.  As of the date hereof, as a result of the transactions described above, evidenced by each of the written assignments, Plaintiff is the owner and holder of the Loan Documents. Plaintiff has custody and possession of the original Notes and Mortgages.

**F.   The Mezzanine Loan**

42.  On or about October 31, 2018, a Mezzanine Loan Agreement was entered into by

and between ML Funding and Chatus, as mezzanine borrower, in the amount of $6,000,000.00 (the "Mezzanine Loan").

43.     Upon information and belief, the Mezzanine Loan was secured by, *inter alia*, a Pledge and Security Agreement (the "Pledge Agreement") dated as of October 31, 2018, made by Chatus in favor of ML Funding, pursuant to which Chatus granted a first priority security interest in all of Chatus's direct and indirect ownership interests in Borrower (the "Equity Collateral").

44.     Original Lender and Mezzanine Lender, entered into an Intercreditor Agreement dated October 31, 2018, a true and correct copy of which is annexed hereto as **Exhibit 34**.

**G.     Borrower's Defaults Under the Loan Documents**

**1.     Borrower's Payment Defaults**

45.     Pursuant to Section 2.2.1 of the Senior Loan Agreement, on each Payment Date through and including the Maturity Date, Borrower was required to "pay to Lender the Monthly Payment Amount."

46.     Pursuant to Section 9.1(a) of the Senior Loan Agreement, an Event of Default shall occur if "any portion of the Debt is not paid when due . . ."

47.     Borrower failed to timely pay the Monthly Payment Amount on the December 9, 2020 Payment Date and each Payment Date thereafter.

48.     Accordingly, Borrower has caused Events of Default under the Loan Documents, which exist and have existed as of the date hereof.

49.     By letter dated December 22, 2020, Borrower was advised of its Events of Default in connection with, *inter alia*, its failure to pay the Monthly Payment Amount due on December 9, 2020 (the "December 2020 Default Letter"), a true and correct copy of which is annexed hereto as **Exhibit 25**.

50.     Borrower failed to cure the Events of Default set forth in the December 2020 Default Letter.

**2.      Borrower Ceases To Do Business As A Hotel and Enters Into Major Contracts Without Plaintiff's Prior Written Consent**

51.     Pursuant to Section 9.1(n) of the Senior Loan Agreement, an Event of Default shall occur if "Borrower ceases to do business as a hotel at the Property or terminates such business for any reason whatsoever (other than a temporary cessation in connection with any continuous and diligent renovation of the Property in connection with the PIP or restoration of the Property following a Casualty or Condemnation)."

52.     Pursuant to Section 9.1(d) of the Senior Loan Agreement, an Event of Default shall occur if "a Transfer other than a Permitted Transfer occurs."

53.     A "Permitted Transfer" is defined to include "a Lease entered into in accordance with the Loan Documents" and a "Lease" is defined as "all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements…"

54.     Pursuant to Section 9.1(u) of the Senior Loan Agreement, an Event of Default shall occur if "a default shall be continuing under any of the other terms, covenants, or conditions of this Agreement or any other Loan Document for ten (10) days after notice to Borrower (and Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default.

55.     Section 6.10.2 of the Senior Loan Agreement provides that "Borrower shall not enter into a proposed Lease … without the prior written consent of Lender."

56.     Section 6.16 provides that "Borrower shall not … undertake or participate in

activities other than the continuance of its present business or otherwise cease to operate the Property as a hotel property or terminate such business for any reason whatsoever (other than a temporary cessation in connection with renovations to the Property in accordance with the PIP)."

57.     Additionally, Section 6.33 of the Senior Loan Agreement, "Borrower shall not, without Lender's prior consent: (a) enter into … any Major Contract to which it is a party or to which Borrower or the Property is subject."

58.     The term "Major Contract" is defined to include "(i) any management, brokerage or leasing agreement."

59.     Pursuant to Section 6.34 of the Senior Loan Agreement, Borrower shall, among other things, "(i) operate the Improvements on the Property in accordance with the terms and conditions of the Franchise Agreement; … (iii) promptly and diligently perform, observe and enforce all of the terms, covenants and conditions of the Franchise Agreement on the part of Borrower to be performed, observed and enforced to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under the Franchise Agreement."

60.     Pursuant to Section 6.35 of the Senior Loan Agreement, Borrower shall, among other things, cause the hotel located on the Property to be operated, repaired, and maintained as a well-maintained "first-class hotel."

61.     On or about May 19, 2020, Borrower entered into that certain Hotel Use Agreement with the City of New York Department of Homeless Services (the "DHS"), dated as of May 19, 2020 (the "DHS Hotel Use Agreement").

62.     The DHS Hotel Use Agreement provided, in part, that Borrower would make 100% of the hotel rooms available to DHS to be used for temporary housing for homeless individuals, which may include non-patient and/or guests who are COVID-19 patients.

63.     The DHS Hotel Use Agreement affected, *inter alia*, the use and occupancy of the Property and Improvements and, as such, constitutes a Lease and Transfer under the Loan Documents.

64.     As a result of Borrower's entry into the DHS Hotel Use Agreement, Borrower ceased doing business as a hotel, given that no hotel rooms were being offered to the general public and the only occupants at the hotel were homeless individuals whose stay was arranged by DHS.

65.     As such, Borrower caused an Event of Default under Section 9.1(n) of the Senior Loan Agreement because by entering into the DHS Hotel Use Agreement.

66.     Borrower failed to obtain Plaintiff's consent before entering into the DHS Hotel Use Agreement.

67.     Borrower's failure to obtain the Plaintiff's consent before entering into the DHS Hotel Use Contract with the City of New York constitutes an unauthorized "Transfer other than a Permitted Transfer," causing an Event of Default under section 9.1(d) of the Senior Loan Agreement.

68.     Borrower defaulted under the terms of the Loan Documents by failing to obtain the Franchisor's (Holiday Hospitality Franchising, LLC) consent before entering into the DHS Hotel Use Agreement.

69.     By letter dated July 13, 2020, Borrower was advised of its Events of Default in connection with the DHS Hotel Use Agreement (the "July 2020 Default Letter"), a true and correct copy of which is annexed hereto as **Exhibit 26**.

70.     Borrower failed to cure the Events of Default set forth in the July 2020 Default Letter.

71.     On or about October 29, 2020, Borrower requested Plaintiff's consent to an

extension of the DHS Hotel Use Agreement, for an extension term of October 13, 2020 through June 30, 2021 on the same terms as the DHS Hotel Use Agreement (the "DHS Extension").

72.     By Conditional Approval Letter dated October 29, 2020 (the "October 2020 Conditional Approval Letter"), Plaintiff conditionally approved the DHS Extension, subject to Borrower's compliance with certain enumerated conditions, including, without limitation, that Borrower remit the monthly check from DHS to the Cash Management Accounts, and continue to comply with the cash management provisions in the Loan Documents.

73.     Borrower failed to comply with the conditions required under the October 2020 Conditional Approval Letter by failing to, among other things, remit the monthly check from DHS in December 2020, and failing to comply with the cash management provisions of the Loan Documents.

74.     As such, Plaintiff's conditional approval of the DHS Extension is deemed withdrawn and the DHS Extension constitutes a further Event of Default under the Loan Documents.

75.     On or about December 8, 2021, Borrower and/or ML Funding entered into that certain Hotel Use Agreement with New York City Health and Hospitals Corporation ("H&H") dated as of December 8, 2021 (the "H&H Hotel Use Agreement").

76.     The H&H Hotel Use Agreement provided, in part, that Borrower would make 100% of the hotel rooms available to H&H which rooms would be used for temporary housing for COVID-19 exposed, symptomatic, or positive individuals.

77.     The H&H Hotel Use Agreement affected, *inter alia*, the use and occupancy of the Property and Improvements and, as such, constitutes a Lease and Transfer under the Loan Documents.

78.     Borrower failed to obtain Plaintiff's consent before entering into the H&H Hotel Use Agreement.

79.     Borrower's failure to obtain the Plaintiff's consent before entering into the H&H Hotel Use Agreement constitutes an unauthorized "Transfer other than a Permitted Transfer," causing an Event of Default under section 9.1(d) of the Senior Loan Agreement.

80.     Borrower also defaulted under the terms of the Loan Documents by failing to obtain the Franchisor's (Holiday Hospitality Franchising, LLC) consent before entering into the H&H Hotel Use Agreement.

81.     By Denial of Request for Approval and Reservation of Rights Letter dated December 13, 2021, Borrower was advised that Plaintiff did not approve the H&H Hotel Use Agreement (the "December 2021 Denial Letter"), a true and correct copy of which is annexed hereto as **Exhibit 27**.

82.     Upon information and belief, on or about January 20, 2022, H&H gave notice to Borrower and/or ML Funding of its determination to terminate the H&H Hotel Use Agreement effective February 4, 2022.

83.     Thereafter, Borrower has failed to reopen the Mortgaged Premises as a hotel, to operate its business as a hotel, and to act in accordance with the Franchise Agreement.

84.     Upon information and belief, the Franchise Agreement has terminated or expired.

85.     Pursuant to Section 6.34(f) of the Senior Loan Agreement, in the event the Franchise Agreement expires or is terminated, Borrower shall promptly enter into a Replacement Franchise Agreement with Franchisor or another Qualified Franchisor.

86.     Borrower has failed to promptly enter into a Replacement Franchise Agreement with Franchisor or another Qualified Franchisor.

87.     Upon information and belief, the liquor license at the Mortgaged Premises has terminated, expired, or been revoked.

88.     Pursuant to Section 6.36.2, Borrower is required to, among other things, maintain a liquor license for the Mortgaged Premises.

**3.     <u>Borrower Violated Cash Management Requirements</u>**

89.     By Notice of Cash Trap Period - Restaurant Lease Trigger Event dated March 20, 2020, Borrower was provided notice of, among other things, that the cancellation or termination of the Restaurant Lease at the Mortgaged Premises, without Plaintiff's prior written consent, caused the occurrence of a Cash Trap Period under the Senior Loan Agreement.

90.     Pursuant to Section 4.1 of the Senior Loan Agreement, "all Rents received by Borrower or Manager shall be deposited into the Clearing Account within one (1) Business Day of receipt."

91.     The term "Rents" is defined broadly in the Senior Loan Agreement to include rents, rent equivalents, income, revenues, and other payments "received by or paid to or for the account of or the benefit of Borrower, Manager, or any of their agents or employees from any and all sources arising from or attributable to the Property and Improvements."

92.     Any and all checks or other payments received by Borrower from DHS and H&H in connection with the DHS Hotel Use Agreement and/or H&H Hotel Use Agreement are Rents under the terms of the Senior Loan Agreement.

93.     Borrower failed to timely deposit Rents and other funds it received from DHS and H&H into the Clearing Account, thereby resulting in an Event of Default under the Loan Documents.

**4.     <u>Borrower's Failure to Comply with Pension Plan Obligations</u>**

94.     Pursuant to Section 6.44 of the Senior Loan Agreement, Borrower is required to

"comply with and cause Manager to comply with any obligations to timely pay all Pension Plan Contributions."

95.     Section 6.44 of the Senior Loan Agreement, provides, in relevant part, that:

(a) Borrower and its Affiliates shall comply with and cause Manager to comply with any obligations to timely pay all Pension Plan Contributions.

(b) Borrower shall furnish to Lender within fifteen (15) days after the end of each calendar month evidence that Borrower, its Affiliates or Manager has timely paid all Pension Plan Contributions (the foregoing clauses (a) and (b) are referred to collectively as the "Pension Plan Contribution Conditions").

96.     Borrower failed to timely provide proof of payment of the Pension Plan Contributions thereby defaulting under the terms of the Loan Documents.

**5.     Borrower's Failure to Cure Liens Recorded Against the Mortgaged Premises.**

97.     Section 6.28 of the Senior Loan Agreement provides that "without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property."

98.     The term "Lien" is defined broadly in the Senior Loan Agreement to include "any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, PACE Loan or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower or Sole Member, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances."

99.     Pursuant to Section 9.1(s) of the Senior Loan Agreement, an Event of Default occurs upon "the filing of any claim of lien or encumbrance against the Property or any part thereof

that is not or bonded off, released within forty-five (45) days."

100.    On or about January 3, 2020, without Plaintiff's knowledge or consent, Borrower entered into the Strulovitch Contract by and between Borrower and Strulovitch, which was recorded on January 14, 2020 in the Office of the City Register at CRFN 2020000015289, a true and correct copy of which is annexed hereto as **Exhibit 28**.

101.    Upon information and belief, that Strulovitch Contract relates to a purported agreement dated November 18, 2019, as amended, for Strulovitch to purportedly purchase the Mortgaged Premises from Borrower.

102.    Borrower failed to obtain Plaintiff's consent to any purported sale of the Mortgaged Premises to Strulovitch or any other party.

103.    The Strulovitch Contract and any purported agreement by Borrower to sell the Mortgaged Premises without Plaintiff's consent constitutes a prohibited Transfer and a Major Contract for which Borrower failed to obtain Plaintiff's prior written consent in violation of the Loan Documents.

104.    By letter dated October 26, 2020, Borrower was advised of its Events of Default in connection with, among other things, the Strulovitch Contract (the "October 2020 Default Letter"), a true and correct copy of which is annexed hereto as **Exhibit 29**.

105.    Borrower failed to cure the Events of Default set forth in the October 2020 Default Letter.

106.    Upon information and belief, on or about February 10, 2022, Shi recorded that certain Declaration of Restriction with the City Register at CRFN 2022000064684.

107.    Upon information and belief, the DOF recorded that certain New York City Tax Warrant No. 617030, dated September 7, 2021, in the amount of $3,812.98.

108.    Upon information and belief, the ECB has filed certain unpaid liens against the Mortgaged Premises including but not limited to: Environmental Control Board Lien against Borrower, No. 37018547J in the current amount of $1,303.01.

109.    Borrower failed to bond off or release the foregoing Liens within 45 days of their being recorded against the Mortgaged Premises.

110.    As a result, Borrower caused further Events of Default under the Loan Documents.

**6.      Borrower's Failure to Pay the Indebtedness Due Under the Loan Documents.**

111.    Pursuant to the terms of the Loan Documents, Borrower was required to make certain specified payments of its outstanding indebtedness under the Loan.

112.    Borrower has failed to pay all amounts due and owing under the Loan Documents when due, beginning with the month of December 2020.

113.    By Notice of Additional Default / Demand to Cure dated January 28, 2021, Borrower was advised of its further defaults (the "January 2021 Notice of Default"), a true and correct copy of which is annexed hereto as **Exhibit 30**.

114.    Borrower has failed to cure its default despite due demand.

115.    By letter dated March 9, 2021 (the "Notice of Acceleration"), Borrower was advised that by reason of the Default, Plaintiff had elected that the whole unpaid principal sums due on the Notes and Mortgages, together with all unpaid interest, late charges, default interest, special servicing fees, loan collections costs, legal or any other costs associated with curing the default, are now due.  A true and correct copy of the Notice of Acceleration is annexed hereto as **Exhibit 31**.

**H.      Guarantors' Recourse Liability Under the Loan Documents**

116.    Pursuant to the Recourse Guaranty, Guarantors are personally liable for (i) Borrower's Recourse Liabilities and (ii) from and after the date that any Springing Recourse Event

occurs, the payment of all the Debt as and when the same is due in accordance with the Loan Documents.

117.    Pursuant to the Senior Loan Agreement, a Springing Recourse Event occurs, when, among other things:  (i) an Event of Default described in Section 9.1(d) of the Senior Loan Agreement shall have occurred; (ix) if Guarantor, Borrower or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Plaintiff under or in connection with the Notes, the Mortgage, or any other Loan Document, seeks a defense, judicial intervention or injunctive or other equitable relief of any kind or asserts in a pleading filed in connection with a judicial proceeding any defense against Plaintiff or any right in connection with any security for the Loan; (x) if, without Plaintiff's prior written consent, the Franchise Agreement is surrendered, terminated, canceled, modified, renewed, extended or otherwise allowed to expire; (xii) the occurrence of a Pension Plan Trigger Event; (xiii) the Restaurant Lease expires or is otherwise canceled, surrendered or terminated for any reason, without the prior written consent of Plaintiff; and (xiv) the absence of a permanent liquor license for the Mortgaged Premises.

118.    As discussed above, an Event of Default described in Section 9.1(d) of the Senior Loan Agreement shall have occurred.

119.    Upon information and belief, without Plaintiff's prior written consent, the Franchise Agreement was surrendered, terminated, canceled, modified, renewed, extended or otherwise allowed to expire.

120.    Upon information and belief, a Pension Plan Trigger Event has occurred.

121.    Upon information and belief, the Restaurant Lease has expires or was otherwise canceled, surrendered or terminated, without the prior written consent of Plaintiff

122.    Upon information and belief, there is not a permanent liquor license for the Mortgaged Premises.

123.    For all of these foregoing reasons, Springing Recourse Events have occurred, and the Loan is full recourse to Guarantors.

124.    Upon information and belief, Guarantors are also liable to Plaintiff for all of Borrower's Recourse Liabilities, as such term is defined in the Senior Loan Agreement.

125.    Despite demand, Guarantors have failed to repay the Debt due to Plaintiff.

**I.    ML Funding Conducts a UCC Sale of the Membership Interests in Borrower**

126.    Upon information and belief, ML Funding declared the Mezzanine Loan in default and held a UCC sale of the membership interests in SAMCOM on June 7, 2021.

127.    Upon information and belief, ML Funding was the successful bidder at the UCC sale.

128.    Upon information and belief, ML Funding claims to own Chatus's membership interests in SAMCOM, and be the sole owner of SAMCOM (owner of the Mortgaged Premises).

129.    ML Funding has failed to cure the Events of Default under the Loan Documents, which remain outstanding and failed to otherwise satisfy the obligations owed to Plaintiff under the Loan Documents and/or in connection with the U.C.C. sale.

130.    Pursuant to Section 6(a) of the Intercreditor Agreement, Mezzanine Lender is not permitted to exercise any rights it may have under the Pledge Agreement with respect to a foreclosure or other realization upon the Equity Collateral (including, without limitation, obtaining title to the Equity Collateral), without Plaintiff's consent, absent meeting certain specified conditions precedent and requirements.

131.    Specifically, pursuant to Section 6(a) of the Intercreditor Agreement, as a condition precedent to any transfer of the Equity Collateral or enforcement of Mezzanine Lender's rights

under the Pledge Agreement, Mezzanine Lender is required to deliver to Plaintiff (x) a New Carveout Guaranty, (y) an environmental indemnity, and (z) a completion guaranty (collectively, the "Third Party Agreements") executed by the transferee of the Equity Collateral (the "New Third Party Obligor").

132. Mezzanine Lender is also required to deliver to Plaintiff a new non-consolidation opinion relating to the transferee of the Equity Collateral within ten (10) Business Days of the transfer of title to the Equity Collateral.

133. Mezzanine Lender must also deliver an opinion of counsel in form reasonably satisfactory to Plaintiff and each Rating Agency regarding the due organization and authorization of the New Third Party Obligor and the enforceability of the respective Third Party Agreements.

134. Further, Mezzanine Lender is required to provide to Plaintiff within five (5) Business Days, an officer's certificate from an officer of Mezzanine Lender certifying that all conditions set forth in Section 6(a) have been satisfied.

135. Pursuant to Section 6(d) of the Intercreditor Agreement, to the extent that Mezzanine Lender forecloses upon or acquires the Equity Collateral, it takes the Equity Collateral subject to the Loan and Loan Documents, including Plaintiff's rights and remedies thereunder.

136. Pursuant to Section 6(d) of the Intercreditor Agreement, it is not a condition precedent to any foreclosure of the Equity Collateral that Mezzanine Lender cure any defaults under the Loan Documents; however, to the extent that Mezzanine Lender enforces its rights under the Pledge Agreement or forecloses upon the Equity Collateral while Events of Default under the Loan Documents are outstanding, Plaintiff continues to retain all of its rights and remedies under the Loan Documents and there is no waiver of the underlying default or Plaintiff's rights or remedies with respect to such underlying default.

137.    Mezzanine Lender failed to meet the requirements and obligations owed to Plaintiff under Section 6(a) of the Intercreditor Agreement, including (a) failing to obtain Plaintiff's written consent to any transfer of the Equity Collateral, (b) failing to obtain Rating Agency Confirmation (as such term is defined in the Intercreditor Agreement), (c) failing to implement hard cash management and adequate reserves for taxes, insurance, debt service, ground rents (if any), capital repair and improvement expenses, tenant improvement expenses and leasing commissions and operating expenses, (d) failing to deliver the Third Party Agreements, (e) failing to deliver the non-consolidation opinion and opinion of counsel as to the due organization and authorization of the New Third Party Obligor and the enforceability of the respective Third Party Agreements, and (f) failing to deliver the officer's certificate certifying that all requirements of Section 6(a) of the Intercreditor Agreement.

138.    Pursuant to Section 6(e) of the Intercreditor Agreement, any exercise by Mezzanine Lender of its rights under Section 6 not made in accordance with the provisions of the Intercreditor Agreement "will be void *ab initio*."

139.    Pursuant to Section 30 of the Intercreditor Agreement, any rights or remedies arising out of any breach of any provision occurring prior to the termination of the Intercreditor Agreement shall survive the termination of the Intercreditor Agreement.

140.    Mezzanine Lender's breaches of the Intercreditor Agreement occurred prior to any termination of the Intercreditor Agreement.

141.    Plaintiff's rights and remedies arising out of Mezzanine Lender's breaches of the Intercreditor survive any termination of the Intercreditor Agreement.

142.    Accordingly, any purported acquisition by Mezzanine Lender of the Equity Collateral constitutes a Transfer (as such term is defined in the Loan Documents) in violation of

the Loan Documents, resulting in an additional Event of Default and Springing Recourse Event.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Foreclosure of Project Loan Mortgage)

143.    Plaintiff repeats and realleges each and every allegation set forth in all prior paragraphs as though fully set forth herein.

144.    Borrower has failed to comply with the terms and provisions of the Loan Documents by, among other things, failing to pay the amounts due under the Project Loan Note and the Project Loan Mortgage, failure to remit required payments of principal and interest when due prior to maturity, and failure to pay the Project Loan Note in its entirety upon its acceleration.

145.    Borrower has failed to pay all amounts due and owing under the Loan Documents when due, beginning with the month of December 2020.

146.    By letters dated July 13, 2020, October 20, 2020, December 22, 2020, and January 28, 2021, Borrower was advised of its Defaults (the "Notices of Default").

147.    Borrower has failed to cure its default despite due demand.

148.    By Notice of Acceleration dated March 9, 2021, Borrower was advised that by reason of the Default, Plaintiff had elected that the whole unpaid principal sums due on the Notes and Mortgages, together with all unpaid interest, late charges, default interest, special servicing fees, loan collections costs, legal or any other costs associated with curing the default, are now due.

149.    As of the date hereof, the total aggregate outstanding principal balance of the Project Loan and Building Loan was $1,777,555.78.  These amounts do not include accrued interest, late charges, default interest, special servicing fees, loan collections costs, legal or any other costs associated with curing the Defaults.

150.    Any interest in or lien upon the Mortgaged Premises held or claimed by any

Defendant is subject to and junior in priority to the lien of Plaintiff's Project Loan Mortgage.

151. Pursuant to the terms of the Project Loan Mortgage, the mortgagee reserved the right to pay taxes and other liens affecting the Mortgaged Premises, which liens, if any, would be and/or are superior to the lien of the Project Mortgage, and which, when paid by the mortgagee, together with interest thereon as provided in said Project Loan Mortgage, are to be added to the amounts due under the Project Loan Mortgage. Plaintiff may be required to pay such liens during the pendency of this action and will demand that such payments so made by it be added to the Project Loan Mortgage debt as aforesaid.

152. Pursuant to the Loan Documents, Borrower must pay Plaintiff's reasonable attorneys' fees expended, costs and expenses incurred to foreclose the Mortgaged Premises.

153. Plaintiff has complied with all the terms and provisions of the Loan Documents.

154. In order to protect its security interest in the Mortgaged Premises, Plaintiff, as it is entitled to do under the Loan Documents, may be compelled to pay, during the pendency of this action, local taxes, assessments, water rates, insurance premiums, and other charges affecting the Mortgaged Premises, and any sums thus paid by Plaintiff for such purposes, together with late payments due thereon, should be added to the sums otherwise due and deemed secured by the Project Loan Mortgage and adjudged a lien.

155. No proceeding other than this action has been commenced to recover the debt secured by the Project Loan Mortgage owed to Plaintiff.

156. Upon information and belief, each and all of the Defendants herein have or claim to have some interest in, or lien upon, the Mortgaged Premises or some part thereof, which interest or lien, if any, has accrued after the lien of the Project Loan Mortgage and are subordinate thereto.

157. In the event that Plaintiff possesses any other lien(s) against said Mortgaged

Premises, other than the Project Loan Mortgage, Plaintiff requests that such other lien(s) shall not be merged in Plaintiff's causes of action set forth in this Complaint, but that Plaintiff shall be permitted to enforce said other lien(s) and/or seek or proceeding(s), including, without limitation, any surplus money proceedings.

158.     Plaintiff shall not be deemed to have waived, altered, released or changed the election hereinafter made by reason of the payment after the date of the commencement of this action of any or all of the defaults mentioned herein, and such election shall continue and remain effective until the costs and disbursements of this action, and any and all future defaults under the Loan Documents, and occurring prior to the discontinuance of this action, are fully paid.

159.     Plaintiff seeks to foreclose upon the Project Loan Mortgage and recover the outstanding principal amount owed under the Project Loan together with accrued interest, late charges, default interest, and any other amounts to be added pursuant to the terms of the Loan Documents, including costs and attorneys' fees and that Borrower be adjudged to pay the whole residue or so much thereof as the Court may determine to be just and equitable, of the debt remaining unsatisfied after the sale of the Mortgaged Premises and the application of the proceeds pursuant to the provisions contained in such judgment, the amount thereof to be determined by the Court as provided in Section 1371 of the Real Property Action and Proceedings Law.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Foreclosure of Building Loan Mortgage)

160.     Plaintiff repeats and realleges each and every allegation set forth in all prior paragraphs as though fully set forth herein.

161.     Borrower has failed to comply with the terms and provisions of the Loan Documents by, among other things, failing to pay the amounts due under the Building Loan Note and the Building Loan Mortgage, failure to remit required payments of principal and interest when

due prior to maturity, and failure to pay the Project Loan Note in its entirety upon its acceleration.

162. Borrower has failed to pay all amounts due and owing under the Loan Documents when due, beginning with the month of December 2020.

163. By Notices of Default dated July 13, 2020, October 20, 2020, December 22, 2020, and January 28, 2021, Borrower was advised of its Defaults.

164. Borrower has failed to cure its default despite due demand.

165. By Notice of Acceleration dated March 9, 2021, Borrower was advised that by reason of the Default, Plaintiff had elected that the whole unpaid principal sums due on the Notes and Mortgages, together with all unpaid interest, late charges, default interest, special servicing fees, loan collections costs, legal or any other costs associated with curing the default, are now due.

166. As of the date hereof, the total aggregate outstanding principal balance of the Project Loan and Building Loan was $1,777,555.78. These amounts do not include accrued interest, late charges, default interest, special servicing fees, loan collections costs, legal or any other costs associated with curing the Defaults.

167. Any interest in or lien upon the Mortgaged Premises held or claimed by any Defendant is subject to and junior in priority to the lien of Plaintiff's Building Loan Mortgage.

168. Pursuant to the terms of the Building Loan Mortgage, the mortgagee reserved the right to pay taxes and other liens affecting the Mortgaged Premises, which liens, if any, would be and/or are superior to the lien of the Building Loan Mortgage, and which, when paid by the mortgagee, together with interest thereon as provided in said Project Loan Mortgage, are to be added to the amounts due under the Project Loan Mortgage. Plaintiff may be required to pay such liens during the pendency of this action and will demand that such payments so made by it be

added to the Project Loan Mortgage debt as aforesaid.

169.    Pursuant to the Loan Documents, Borrower must pay Plaintiff's reasonable attorneys' fees expended,  costs and expenses incurred to foreclose the Mortgaged Premises.

170.    Plaintiff has complied with all the terms and provisions of the Loan Documents.

171.    In order to protect its security interest in the Mortgaged Premises, Plaintiff, as it is entitled to do under the Loan Documents, may be compelled to pay, during the pendency of this action, local taxes, assessments, water rates, insurance premiums, and other charges affecting the Mortgaged Premises, and any sums thus paid by Plaintiff for such purposes, together with late payments due thereon, should be added to the sums otherwise due and deemed secured by the Building Loan Mortgage and adjudged a lien.

172.    No proceeding other than this action has been commenced to recover the debt secured by the Building Loan Mortgage owed to Plaintiff.

173.    Upon information and belief, each and all of the Defendants herein have or claim to have some interest in, or lien upon, the Mortgaged Premises or some part thereof, which interest or lien, if any, has accrued after the lien of the Building Loan Mortgage and are subordinate thereto.

174.    In the event that Plaintiff possesses any other lien(s) against said Mortgaged Premises, other than the Building Loan Mortgage, Plaintiff requests that such other lien(s) shall not be merged in Plaintiff's causes of action set forth in this Complaint, but that Plaintiff shall be permitted to enforce said other lien(s) and/or seek or proceeding(s), including, without limitation, any surplus money proceedings.

175.    Plaintiff shall not be deemed to have waived, altered, released or changed the election hereinafter made by reason of the payment after the date of the commencement of this action of any or all of the defaults mentioned herein, and such election shall continue and remain

effective until the costs and disbursements of this action, and any and all future defaults under the Loan Documents, and occurring prior to the discontinuance of this action, are fully paid.

176.     Plaintiff seeks to foreclose upon the Building Loan Mortgage and recover the outstanding principal amount owed on the Building Loan together with accrued interest, late charges, default interest, and any other amounts to be added pursuant to the terms of the Loan Documents, including costs and attorneys' fees and that Borrower be adjudged to pay the whole residue or so much thereof as the Court may determine to be just and equitable, of the debt remaining unsatisfied after the sale of the Mortgaged Premises and the application of the proceeds pursuant to the provisions contained in such judgment, the amount thereof to be determined by the Court as provided in Section 1371 of the Real Property Action and Proceedings Law.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Foreclosure of Senior Loan Mortgage)

177.     Plaintiff repeats and realleges each and every allegation set forth in all prior paragraphs as though fully set forth herein.

178.     Borrower has failed to comply with the terms and provisions of the Loan Documents by, among other things, failing to pay the amounts due under the Senior Loan Note and the Senior Loan Mortgage, failure to remit required payments of principal and interest when due prior to maturity, and failure to pay the Senior Loan Note in its entirety upon its acceleration.

179.     Borrower has failed to pay all amounts due and owing under the Loan Documents when due, beginning with the month of December 2020.

180.     By Notices of Default dated July 13, 2020, October 20, 2020, December 22, 2020, and January 28, 2021, Borrower was advised of its Defaults.

181.     Borrower has failed to cure its default despite due demand.

182.     By Notice of Acceleration dated March 9, 2021, Borrower was advised that by

reason of the Default, Plaintiff had elected that the whole unpaid principal sums due on the Notes and Mortgages, together with all unpaid interest, late charges, default interest, special servicing fees, loan collections costs, legal or any other costs associated with curing the default, are now due.

183.    As of the date hereof, the total outstanding principal balance of the Senior Loan Note and the Senior Loan Mortgage was $21,000,000.  These amounts do not include accrued interest, late charges, default interest, special servicing fees, loan collections costs, legal or any other costs associated with curing the Defaults.

184.    Any interest in or lien upon the Mortgaged Premises held or claimed by any Defendant is subject to and junior in priority to the lien of Plaintiff's Senior Loan Mortgage.

185.    Pursuant to the terms of the Senior Loan Mortgage, the mortgagee reserved the right to pay taxes and other liens affecting the Mortgaged Premises, which liens, if any, would be and/or are superior to the lien of the Senior Loan Mortgage, and which, when paid by the mortgagee, together with interest thereon as provided in said Senior Loan Mortgage, are to be added to the amounts due under the Senior Loan Mortgage.  Plaintiff may be required to pay such liens during the pendency of this action and will demand that such payments so made by it be added to the Senior Loan Mortgage debt as aforesaid.

186.    Pursuant to the Loan Documents, Borrower must pay Plaintiff's reasonable attorneys' fees expended,  costs and expenses incurred to foreclose the Mortgaged Premises.

187.    Plaintiff has complied with all the terms and provisions of the Loan Documents.

188.    In order to protect its security interest in the Mortgaged Premises, Plaintiff, as it is entitled to do under the Loan Documents, may be compelled to pay, during the pendency of this action, local taxes, assessments, water rates, insurance premiums, and other charges affecting the

Mortgaged Premises, and any sums thus paid by Plaintiff for such purposes, together with late payments due thereon, should be added to the sums otherwise due and deemed secured by the Senior Loan Mortgage and adjudged a lien.

189.    No proceeding other than this action has been commenced to recover the debt secured by the Senior Loan Mortgage owed to Plaintiff.

190.    Upon information and belief, each and all of the Defendants herein have or claim to have some interest in, or lien upon, the Mortgaged Premises or some part thereof, which interest or lien, if any, has accrued after the lien of the Senior Loan Mortgage and are subordinate thereto.

191.    In the event that Plaintiff possesses any other liens against said Mortgaged Premises, other than the Senior Loan Mortgage, Plaintiff requests that such other lien(s) shall not be merged in Plaintiff's causes of action set forth in this Complaint, but that Plaintiff shall be permitted to enforce said other lien(s) and/or seek or proceeding(s), including, without limitation, any surplus money proceedings.

192.    Plaintiff shall not be deemed to have waived, altered, released or changed the election hereinafter made by reason of the payment after the date of the commencement of this action of any or all of the defaults mentioned herein, and such election shall continue and remain effective until the costs and disbursements of this action, and any and all future defaults under the Loan Documents, and occurring prior to the discontinuance of this action, are fully paid.

193.    Plaintiff seeks to foreclose upon the Senior Loan Mortgage and recover the outstanding principal amount of $21,000,000.00 together with accrued interest, late charges, default interest, and any other amounts to be added pursuant to the terms of the Loan Documents, including costs and attorneys' fees and that Borrower be adjudged to pay the whole residue or so much thereof as the Court may determine to be just and equitable, of the debt remaining unsatisfied

after the sale of the Mortgaged Premises and the application of the proceeds pursuant to the provisions contained in such judgment, the amount thereof to be determined by the Court as provided in Section 1371 of the Real Property Action and Proceedings Law.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Consolidation of Project Loan Mortgage, Building Loan
Mortgage and Senior Loan Mortgage for Foreclosure)**

194.    Plaintiff repeats and realleges each and every allegation set forth in all prior paragraphs as though fully set forth herein.

195.    The total aggregate outstanding principal balance of the Senior Loan Mortgage, Building Loan Mortgage, and Project Loan Mortgage is $22,777,555.78.

196.    Plaintiff requests consolidation of Plaintiff's Senior Loan Mortgage, Building Loan Mortgage, and Project Loan Mortgage for the purpose of holding a single foreclosure sale.

197.    The Senior Loan Mortgage, Building Loan Mortgage, and Project Loan Mortgage are contemporaneous instruments between the same parties and related and form part of one and the same loan transaction.   Moreover, the Senior Loan Agreement executed simultaneously therewith provides:

> ***Total Outstanding Principal Amount:*** shall mean the sum of (i) the then-outstanding Principal balance of the Loan, (ii) the then-outstanding principal balance of the Building Loan and (iii) the then-outstanding principal balance of the Project Loan.

198.    Upon information and belief, there are no judgments or liens docketed between the dates that the Senior Loan Mortgage, Building Loan Mortgage, and Project Loan Mortgage were recorded.

199.    Consolidation of Plaintiff's Senior Loan Mortgage, Building Loan Mortgage, and Project Loan Mortgage for the purpose of holding a single foreclosure sale would not affect any potential judgment lien holders.

## AS AND FOR A FIFTH CAUSE OF ACTION
**(Alternative Relief for Successive Foreclosure Sales of the Project Loan Mortgage, Building Loan Mortgage, and Senior Loan Mortgage)**

200.    Plaintiff repeats and realleges each and every allegation set forth in all prior paragraphs as though fully set forth herein.

201.    In the alternative, Plaintiff requests that a judgment be entered which expressly directs and authorizes a foreclosure sale of the Project Loan Mortgage, and then expressly directs and authorizes the foreclosure sale of the Building Loan Mortgage, and that then authorizes and directs immediately thereafter auctioning the Mortgaged Premises pursuant to the foreclosed Senior Loan Mortgage.

## AS AND FOR A SIXTH CAUSE OF ACTION
**(Breach of the Guarantees)**

202.    Plaintiff repeats and realleges each and every allegation set forth in all prior paragraphs as though fully set forth herein.

203.    Gurantors Chen and Chau have failed to comply with the terms of their Guarantees by failing to pay the indebtedness due from Borrower to the Plaintiff under the Loan Documents.

204.    Guarantors have failed to cure their defaults despite due demand by Plaintiff in the Notices of Default dated July 13, 2020, October 20, 2020, December 22, 2020, and January 28, 2021.

205.    Plaintiff has complied with the terms and provisions of the Loan Documents.

206.    No proceeding other than this action has been commenced to recover the debt owed to Plaintiff under the Guarantees.

207.    As such, Guarantors Chen and Chau are each individually liable to Plaintiff, among other things, for all of Borrower's Guaranteed Obligations under the Senior Loan Note, Building

Loan Note, Project Loan Note and Loan Documents, and all amounts due from Borrower under the Loan to the extent that a certain recourse event has occurred.

208.     Accordingly, Plaintiff seeks to foreclose upon the Senior Loan Mortgage, Building Loan Mortgage and Project Loan Mortgage and recover the aggregate outstanding principal amount of $22,777,555.78 together with accrued interest, late charges, default interest, and any amounts to be added pursuant to the terms of the Loan Documents, including costs and attorney's fees, and Guarantors should each be adjudged to pay the whole residue or so much thereof as the Court may determine to be just and equitable, of the debt remaining unsatisfied after the sale of the Mortgaged Premises and the application of the proceeds pursuant to the provisions contained in such judgment, the amount thereof to be determined by the Court as provided in Section 1371 of the Real Property and Proceedings Law.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Breach of the Intercreditor Agreement)

209.     Plaintiff repeats and realleges each and every allegation set forth in all prior paragraphs as though fully set forth herein.

210.     Mezzanine Lender was required to comply with the requirements of the Intercreditor Agreement when it exercised its rights of foreclosure and/or realization upon the Equity Collateral, including when Mezzanine Lender acquired Mezzanine Borrower's membership interests in SAMCOM.

211.     Mezzanine Lender failed to comply with the provisions of the Intercreditor Agreement.

212.     Mezzanine Lender failed to keep Plaintiff reasonably apprised as to the status of its actions as required under Section 6(a) of the Intercreditor Agreement.

213.     Mezzanine Lender failed to deliver timely notice of any transfer of the Equity

Collateral.

214.     Mezzanine Lender failed to obtain Plaintiff's consent prior to exercising its rights under the Pledge Agreement and other Mezzanine Loan Documents with respect to a foreclosure or other realization upon the Equity Collateral.

215.     Mezzanine Lender failed to obtain Rating Agency Confirmation and the approval of Plaintiff as required by Section 6(a) of the Intercreditor Agreement.

216.     Mezzanine Lender failed to implement hard cash management and adequate reserves for taxes, insurance, debt service, ground rents (if any), capital repair and improvement expenses, tenant improvement expenses and leasing commissions and operating expenses.

217.     Mezzanine Lender failed to deliver to Plaintiff the Third Party Agreements.

218.     Mezzanine Lender failed to deliver to Plaintiff a non-consolidation opinion and opinion of counsel as to the due organization and authorization of the New Third Party Obligor and the enforceability of the respective Third Party Agreements.

219.     Mezzanine Lender failed to deliver to Plaintiff an officer's certificate certifying that all requirements of Section 6(a) of the Intercreditor Agreement were satisfied.

220.     By taking over control of SAMCOM without delivering the required documents to Plaintiff, Mezzanine Lender has reduced the value of Plaintiff's security that is available to repay the Loan, and Plaintiff cannot recover from Mezzanine Lender's affiliates because they have not delivered a guaranty or environmental indemnity, causing damage to Plaintiff.

221.     Plaintiff complied with its obligations under the Intercreditor Agreement.

222.     Mezzanine Lender failed to comply with the provisions of the Intercreditor Agreement, which constitutes a material breach of the Intercreditor Agreement.

223.     By virtue of the foregoing, Plaintiff has been damaged in an amount to be

determined at trial.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Specific Performance)

224.    Plaintiff repeats and realleges each and every allegation set forth in all prior paragraphs as though fully set forth herein.

225.    The Intercreditor Agreement is a valid, binding, and enforceable contract.

226.    Pursuant to the Intercreditor Agreement, Mezzanine Lender was required to comply with the requirements of Section 6 in the event it exercised its remedies against Mezzanine Borrower.

227.    Pursuant to Section 33 of the Intercreditor Agreement, Mezzanine Lender agreed that:

> Senior Lender and Mezzanine Lender each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either Senior Lender or Mezzanine Lender hereunder would cause irreparable harm to the other. Accordingly, Senior Lender and Mezzanine Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such nonbreaching party.

228.    Mezzanine Lender is capable of performing its obligations under the Intercreditor Agreement, including delivering to Plaintiff the New Carveout Guaranty, environmental indemnity, and completion guaranty, delivering to Plaintiff the non-consolidation opinion and opinion of counsel as to the due organization and authorization of the New Third Party Obligor and the enforceability of the respective Third Party Agreements, and delivering to Plaintiff the officer's certificate certifying that all requirements of Section 6(a) of the Intercreditor Agreement.

229.    Denying the relief requested herein would constitute the loss of a bargained-for contractual right of control for Plaintiff, and monetary damages would be an insufficient remedy.

230.    Plaintiff has no adequate remedy at law.

231.    By reason of the foregoing, Plaintiff seeks a judgment directing specific performance by Mezzanine Lender of its obligations under Section 6 of the Intercreditor Agreement.

**AS AND FOR A NINTH CAUSE OF ACTION**
**(Declaratory Judgment)**

232.    Plaintiff repeats and realleges each and every allegation set forth in all prior paragraphs as though fully set forth herein.

233.    An actual and justiciable controversy exists regarding whether the Mezzanine Lender's exercise of its remedies with respect to the Equity Collateral, including its acquisition of the membership interests of SAMCOM and taking control of the Mortgaged Premises is void *ab initio* due to Mezzanine Lender's failure to act in accordance with the Intercreditor Agreement.

234.    In the alternative, Plaintiff is entitled to a declaration that Mezzanine Lender's actions are void *ab initio*.

**WHEREFORE,** Plaintiff demands judgment as follows:

a.      That Plaintiff's Senior Loan Mortgage, Building Loan Mortgage, and Project Loan Mortgage be consolidated for the purpose of holding a single foreclosure sale;

b.      That in the alternative, if Plaintiff's Senior Loan Mortgage, Building Loan Mortgage, and Project Loan Mortgage are not consolidated, that the Project Loan Mortgage be foreclosed first, and that another foreclosure sale take place immediately thereafter auctioning the Mortgaged Premises pursuant to the foreclosed Building Loan Mortgage, and that another foreclosure sale take place immediately thereafter auctioning the Mortgaged Premises pursuant to the foreclosed Senior Loan Mortgage;

c. That all defendants, and all persons claiming under them be barred and forever foreclosed of all tight, title, lien, claim and equity of redemption in and to the Mortgaged Premises and all collateral secured by the Loan Documents with all of its fixtures, except for the right of the United States of America and its political divisions, to be redeemed as provided by applicable law;

d. That the Mortgaged Premises and all collateral secured by the Loan Documents be sold as to obtain the greatest return of sale, whether sold jointly as a single parcel or sold separately as two or more parcels;

e. That the money raised from the sale of the Mortgaged Premises and all collateral secured by the Loan Documents be paid into Court and Plaintiff be paid first (i) the aggregate principal sum of $22,777,555.78 due and owing under the Loan Documents, with interest to the time of payment; (ii) late charges; (iii) all sums, including payment of taxes and other charges, which may be expended by plaintiff to protect its security interest in the Mortgage, and (iv) just and reasonable compensation for the services of Plaintiff; and its counsel, agents and employees, (v) any other amounts due under the Loan Documents; (vi) reasonable costs and attorneys' fees incurred by Plaintiff in enforcing this action;

f. That Borrower and Guarantors be adjudged liable under the Loan Documents for all amounts of the debt remaining unsatisfied after the application of the proceeds of such sale pursuant to a judgment of foreclosure in accordance with RPAPL §1371 to the extent provided under the Loan Documents and Recourse Guaranty;

g. That Borrower and Guarantors be adjudged liable under the Loan Documents for reasonable costs and attorneys' fees incurred by Plaintiff in enforcing this action;

h. That upon a separate application, Plaintiff shall be entitled to the appointment of a receiver of the rents and profits of the Mortgaged Premises;

i.      That the purchaser(s) of the Mortgaged Premises at such foreclosure sale be awarded a writ of possession and all other persons in possession of the premises be evicted;

j.      That Plaintiff be awarded damages against Mezzanine Lender in an amount to be determined at trial;

k.      That Mezzanine Lender be directed to specifically perform all requirements of Section 6 of the Intercreditor Agreement;

l.      That, in the alternative, declaratory judgment be entered deeming the Mezzanine Lender's enforcement actions void ab initio; and

m.      That Plaintiff be awarded such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
       July 27, 2022

                                 HOLLAND & KNIGHT LLP

                     By: */s/ Vivian M. Arias*                        
                         Vivian M. Arias, Esq.
                         John M. Doherty, Esq.
                         *Attorneys for Plaintiff Wilmington Trust, National*
                         *Association, as Trustee for the Registered Holders*
                         *of The Bancorp Commercial Mortgage 2019-CRE5*
                         *Trust, Commercial Mortgage Pass-Through*
                         *Certificates, Series 2019-CRE5*
                         900 Third Avenue, 20th Floor
                         New York, New York 10022
                         (212) 751-3001

## VERIFICATION

STATE OF TEXAS                          )
                                        ) ss.:
COUNTY OF DALLAS                        )

      CRAIG CAUTHEN, being duly sworn, deposes and says:

      I am a Servicing Officer at Trimont Real Estate Advisors, LLC ("Special Servicer"), in its

capacity the Special Servicer for the Loan that is the subject of this Complaint.  I have read the

annexed Amended Complaint, know the contents thereof and the same are true to my knowledge,

except as to those matters which are stated to be alleged upon information and belief and as to

those matters I believe them to be true.  The source of my knowledge is my personal involvement

in the Loan at issue and my review of the files and business records of maintained by Plaintiff and

Special Servicer on behalf of Plaintiff, which are regular maintained by them in the court of their

business.

                                         CRAIG CAUTHEN

STATE OF TEXAS                          )
                                        ) ss.:
COUNTY OF DALLAS                        )

      On the **27th** day of July in the year 2022 before me, the undersigned personally appeared
Craig Cauthen, personally known to me or proved to me on the basis of satisfactory evidence to
be the individual whose name is subscribed to the within instrument and acknowledged to me that
he executed the same in his capacity, and that by his signature on the instrument, the individual,
or the person upon behalf of the which the individual acted, executed the instrument in the
City/Town of Dallas, State of Texas.

_____
NOTARY PUBLIC

> CASEY W. MAXWELL
> Notary Public, State of Texas
> Comm. Expires 05-20-2026
> Notary ID 133772693

7/27/2022

43